## Abraham Fur Co. *v.* Cameron et al., Appellants.

Argued November 30, 1928. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Robert T. McCracken,* with him *W. Nelson L. West* and *Roberts & Montgomery,* for appellants.—There was never any binding contract between the parties for the purchase and sale of this wool: Frick & Lindsay Co. v. Ry., 271 Pa. 536; Clements v. Bolster, 6 Pa. Superior Ct. 411; Rasche & Co. v. Campbell, 276 Pa. 268; Gianni v. Russell & Co., 281 Pa. 320; Humphrey v. Brown, 291 Pa. 53.

The sale being subject to approval, was not made until the goods were approved: Hutchinson Baking Co. v. Marvel, 270 Pa. 378; Penna. Lubricating Co. v. Wilhelm, 255 Pa. 390; Swing v. Walker, 27 Pa. Superior Ct. 366.

*Yale L. Schekter,* with him *Brown & Williams,* for appellee.—The right of disapproval was not an arbitrary one but it must relate to the specifications of the contract.

To establish a custom, there must be numerous repetitions of the act, extending over a considerable period of time: Carlo v. R. R., 293 Pa. 343.

The submission to the jury was proper: Com. v. Sanderson, 11 Dauphin Co. R. 197.

A valid contract existed: Pa. Lubricating Co. v. Wilhelm, 255 Pa. 390; Sloan Corp. v. Linton, 260 Pa. 569.

OPINION BY MR. JUSTICE SCHAFFER, February 11, 1929:

This is an action of assumpsit in which plaintiff, the seller of wool, claims the right to recover damages from defendants, the alleged purchasers, by reason of the lat-

ter's refusal to accept the goods. The trial resulted in a verdict and judgment in plaintiff's favor; defendants appealed.

By both sides we are referred, for the contract or arrangement between the parties, to a series of telegrams between the defendants in Philadelphia and Renard & Henley, wool brokers in St. Louis, who admittedly throughout the dealing acted as middlemen and agents for both parties. The telegrams from Renard & Henley are more in the nature of reports back by them to defendants, of what took place in St. Louis, where the plaintiff had its place of business, than they are replies to or negotiations with defendants in behalf of the plaintiff. Since we do not have before us, however, anything that took place between Renard & Henley and plaintiff in St. Louis and as all counsel point to the telegrams as forming the contract, we shall so consider them. In the first, from defendants to Renard & Henley they inquired for the lowest price on a carload of "three-eights Missouri wool and give us the estimated shrinkage," to which the brokers replied: "Abraham [plaintiff] talks fifty six delivered for his approximately hundred thousand three eights combing which contains thirty per cent clothing and shrinks forty eight per cent." Defendants acknowledged this message and telegraphed the brokers: "You may offer Abrahams fifty four cents for one hundred thousand three eights alone Philadelphia delivery subject Rineharts packing and approval." (Explanation should be made that "combing" and "three eights" are a longer staple and more valuable grade of wool than "clothing.") The brokers answered: "Abraham opposed selling three eights alone under fifty six delivered" and followed this with another message to defendants four days later, "Subject your confirmation Rineharts approval bought car twenty five thousand three eights of Abraham at fifty five cents delivered. Think best Rinehart come as may line up Abraham on balance his three eights." To which defendant replied: "Your purchase

of the car of Abrahams three eights is satisfactory. Not worth while for Rinehart to go to St. Louis unless you can get refusal on hundred thousand pounds more wool at our prices or lower." The brokers answered: "Subject Rinehart approval bought balance Abraham three eights estimated seventy five thousand for you at fifty five cents delivered making total purchases for you from this firm of approximately one hundred thousand pounds. When can we expect Rinehart." Defendants wired: "We are in receipt of your telegram saying that you have bought the 75,000 lbs. Abrahams $\frac{3}{8}$s at 55c and when will Rinehart be out. Rinehart plans to leave here next Saturday night, and be ready to start to approve the wool next Monday morning." This telegram was sent on February 12th.

Rinehart went to St. Louis, commenced an examination of the wool, which was in bags. In order to permit of an examination they had to be opened. After being afforded the opportunity of examining a few of them, he refused approval. On February 26th plaintiff telegraphed defendants: "Unless Rinehart accepts wool as sold to you seventy per cent combing thirty per cent clothing shall be forced to sell this wool at best price possible and hold you responsible for any loss or damage sustained." Defendants wired Rinehart not to approve any wools not strictly $\frac{3}{8}$ combing. He refused to accept the wool after plaintiff had tendered an examination of all of it and they sold it at 50½ cents per pound. The verdict in plaintiff's favor represents the difference between this price and defendants' offer of 55 cents, less freight allowances.

The dispute centers in the meaning in the wool trade and under its usage of the words "subject Rinehart's packing and approval." Appellants contend that this clause gave them the right to reject the wool for any cause or without cause assigned; in other words, that they had a buyer's option on it and had not made a binding contract to take it until Rinehart, their buyer, ap-

proved, whereas appellee's position is, that appellants by their telegrams had entered into a binding contract of purchase, provided the wool contained seventy per cent combing and thirty per cent clothing, which they say it did; that Rinehart could not reject it under the contract because of its clothing content of thirty per cent and that he rejected it solely on this ground.

A very important witness in the case would have been Rinehart; he was dead at the time of the trial. We do not know just why he did not approve the wool save as his words and acts are interpreted by others. He was an expert wool buyer. After his arrival in St. Louis, he wrote appellants: "The Abrahams 100 we found had been packed up in sacks so that they could have the room for their fur business and they insist it being taken as it is. On examination of the lot we believe it will have about 30 per cent of clothing wool in it as it was not graded for strictly combing wool. Henley's [the broker's] report on this is his telegram of January 22d to you reports this to you. We believe the shrinkage of 49 per cent is about right. There is a very occasional low three eights fleece in it, but for all it is not as good grade as the Wahlert car, which was fifty five cents del. Philada. To be candid this is not a choice lot of wool." Rinehart on the following day telegraphed appellants to the same effect as the letter, saying: "Wool is packed in sacks and they insist on being taken as graded in the bags," to which appellants replied: "Note report on Abrahams wool; do not approve any wools that are not strictly jubilant combing [meaning $\frac{3}{8}$ combing]. Approval in bags won't do; you must handle every fleece."

Henley testified that when Rinehart reached St. Louis he came to his office and that he conducted him to plaintiff's warehouse. They there found the wool packed in bags, about 400 in number, averaging 200 pounds to the bag. Representatives of plaintiff were present who opened about ten bags which Rinehart proceeded to inspect. After doing so, he informed them that he could

not accept the wool in the bags and would have to repack it. Thereupon one of them told him they could not let him repack the wool; that they would do so on one condition, if he took it as it was "but if he thought he could repack the wool and throw anything out, he would not allow that." The upshot of the conversation was that Rinehart finally said he would not approve the wool and then plaintiff's representative notified him that he would wire appellants that unless they accepted the wool it would be sold and suit would be entered for any damages that plaintiff might sustain through selling at a lower price, to which Rinehart again replied that he did not approve. The following day plaintiff's representative called Henley, asked him if Rinehart was still in town and, being informed he was, told Henley to tell him that he had decided to let him repack the wool. Being informed of this, Rinehart said that this was the proposition he had offered the day before "to go through the wool, but I don't go up today to repack it. I am through with the deal." Rinehart telegraphed defendants that plaintiff had offered to allow him to rehandle the wool "but not to take strict combing selection insisting the thirty per cent clothing edge must be taken. Have turned down the lot." Henley in his testimony said that Rinehart's objection to the wool was not alone because of the "cloth edge" but because he did not like the color and also that there might have been other objectionable features. Another experienced wool buyer who examined it testified that the shrinkage would be 10 per cent more than 48 per cent, which was the shrinkage represented in the telegram offering it and that it was not a good color. It was testified by plaintiff's representative that Rinehart wanted to throw the clothing wool out.

In fixing the extent of the undertaking of plaintiff and defendants it is important to bear in mind that Henley, the broker, was acting as middleman and agent for both parties and in the capacity of both seller and buyer.

Whatever he said in either capacity was as though said by the particular actor in the transaction for whom he was then speaking: Mechem on Agency (2d ed.), volume 1, section 178; volume 2, section 2374. His understanding of the respective obligations of each of them must be held under the circumstances to be binding upon both of them and his understanding of the trade usage of the wool business in legal effect was transmitted to them and became their understanding, otherwise what he conceived to be their respective rights might have misled both or either of them.

In our opinion the critical inquiry in the case is what was Henley's understanding of what by usage was implied by the words "subject Rinehart's packing and approval." He was the mutual agent of the parties and, as we have stated, his understanding under the circumstances was the seller's understanding. He testified that the words "subject to packing and approval" mean that the buyer has the right to rehandle the fleeces, to inspect them, to have the bags opened and the fleeces placed before him and to go through the entire lot with the right to reject any fleece; that the wool business is peculiar and different from other lines of business; that wools are sold subject to the buyer's approval and acceptance; that the words quoted imply that the buyer examines the wool, and if it does not meet with his approval *for the purpose he has in mind* that he is not required to take it; that inspectors might differ as to the quality of the wool, but that the opinion of the buyer's inspectors is controlling. In answer to a question by the court as to what the situation would be where a contract specifically provided that the wool should be 70% combing and 30% clothing and sold subject to approval, he said that the dealing for wool is always made subject to the inspector's approval or rejection, regardless of the grade. While it is true he said in answer to another question that where there was a written contract such would be controlling, it is not at all clear that he was speaking of

a transaction evidenced as is this one by communications passing between the parties, but rather of a situation where they had sat down together and drawn up a formal written contract. From a reading of his entire testimony, it is easy of conclusion that in his opinion, under such negotiations as were carried on in the correspondence in this case, the wool was sold subject to the buyer's option.

There was further testimony along the line by one of defendants and by witnesses whom they called, extensively engaged in the wool business, that, in the usage of the trade, sales such as that made here, subject to inspection and packing, do not imply an absolute sale, but give a buyer's option to take the wool at the price, provided it is approved on inspection. There was countervailing testimony in behalf of plaintiff in which it was stated by witnesses claiming to be familiar with the wool trade that they had no knowledge of such a usage. It was testified by the buyer of one of the largest wool houses in the trade that the term "combing" and "clothing" have not stable meanings and are not uniform terms, that one manufacturer would want wool for one purpose and would take a certain kind, grade or size of wool under the description of "combing," whereas another manufacturer engaged in the fabrication of a different article would consider the wool as coming within the description of "clothing." Defendants, it should be pointed out, are manufacturers of, not dealers in, wool.

The existence or nonexistence of the custom or usage is not the controlling question in the case; testimony as to its existence or nonexistence is important only in so far as it aids in solving the controlling question, which, as we have stated, is, what was Henley's understanding, under the usage of the trade, of the meaning of the phrase which he used when he was conducting the negotiations for both parties. As before stated, his testimony strongly indicates that as he understood the usage in connection with the language employed, appel-

lants had the right to reject the wool if it did not meet with their inspector's approval on any ground. If plaintiff itself had so understood, then, of course, defendants would not be bound, and Henley's understanding as their agent was their understanding and with equal reason they are bound by what he understood and meant to convey to defendants by the terms he used. In his telegram notifying defendants that he had purchased the wool, he informed them that he had bought it "subject Rinehart's approval." If by this he meant to inform them that the purchase was at their option, that they had the right to refuse to take the wool on any ground and that the contract of sale was not completed until Rinehart had approved it, plaintiff, in view of the duality of his relation, cannot assert otherwise. Our conclusion regarding the importance of Henley's understanding of the language "subject to approval" is predicated on the fact of its usage in the trade and under the trade's usage of its meaning. It is not our intention to say that if there clearly was no such usage or custom in the trade as carried the meaning which defendants allege, as for example, if no one had ever heard of such usage, the agent's pretended understanding would be controlling on his principals, the sellers.

The trial judge submitted to the jury as the controlling question in the case whether Rinehart had rejected the wool in bad faith, arbitrarily, capriciously and without reason, solely on the ground that it happened to contain some "clothing," saying to them that if there was sufficient in the testimony to justify such a conclusion, this was something which the law will not permit, and, in that situation, the plaintiff would be entitled to recover. There was, however, no testimony that Rinehart had rejected the wool in bad faith and, as we have stated, that was not the controlling question; it was error to so charge.

The case, briefly, comes to this, that since Henley acted for Abraham, the plaintiff, and since in so doing

he used an expression on their behalf which is susceptible of a meaning contended for by defendants, if Henley used the expression with that meaning and made a contract between plaintiff and defendants on that basis, the court should enforce such contract accordingly; therefore the case must go back for another trial in order that the specific inquiry may be made of Henley as to what he understood by the words "Rinehart's packing and approval." If he understood and acted on the basis that these words meant that defendants had the right to reject the wool for any cause, in other words, if it was a buyer's option transaction, and he sold the wool to them on this assumption, then Rinehart's action in rejecting it was justified and plaintiff is not entitled to recover. If on the other hand, he understood and acted on the basis that he was making an outright sale provided the wool fulfilled the specification of 70% combing and 30% clothing, and that nothing was required beyond these qualifications, then defendants could inspect only to ascertain these facts, for such was the contract, and recovery may be had accordingly. On the next trial there should be submitted to the jury for special finding the question: Was it Henley's understanding in negotiating the sale that the term "subject Rinehart's packing and approval" meant that the wool was sold at the buyer's option? If this question be answered by the jury in the affirmative, then plaintiff's recovery should be denied; otherwise it may recover.

In this connection we think it proper to state that we look with strong favor upon special findings by juries. They throw clear light upon controverted questions and greatly aid just determinations both in courts of first instance and upon appeal. Wherever there are controlling questions in a cause they should be submitted for the jury's answer in addition to the general finding. If this be done, much of the criticism of trial by jury will cease.

The third assignment of error is sustained and a new trial awarded.